896 F.2d 54
 22 Collier Bankr.Cas.2d 551, 20 Bankr.Ct.Dec. 282,
Bankr. L. Rep. P 73,266
 In the Matter of BEVILL, BRESLER & SCHULMAN ASSET MANAGEMENT
CORPORATION, Debtor.
Saul S. COHEN, Trustee of Bevill, Bresler & Schulman Asset
Management Corporation
v.
The SAVINGS BUILDING & LOAN COMPANY, Appellant.
 No. 89-5422.
 United States Court of Appeals, Third Circuit.
 Argued Dec. 13, 1989.
Decided Feb. 22, 1990.
 
 Gilbert Backenroth (argued), Hahn & Hessen, New York City, for appellant.
 Gary N. Marks (argued), Ravin, Greenberg & Zackin, P.A., Roseland, N.J., for appellee.
 Before HUTCHINSON, COWEN and WEIS, Circuit Judges.
 OPINION OF THE COURT
 COWEN, Circuit Judge.
 
 
 1
 This appeal involves the application of the law of setoff to a series of securities repurchase agreements, or "repos," between Savings Building & Loan Company ("Savings") and Bevill, Bresler & Schulman Asset Management Corporation ("AMC"). After AMC filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code, its Trustee, Saul S. Cohen, commenced an action in district court to compel Savings to turnover the value of securities and interest payments AMC claimed it was owed under several repurchase agreements. As a defense to turnover, Savings set up its right to set off the value of the securities and interest payments against a claim it held against AMC. The district court granted summary judgment in favor of the Trustee and denied summary judgment to Savings. We will affirm in part and reverse in part.
 
 I.
 
 2
 AMC was a dealer in government securities, incorporated in New Jersey and maintaining offices in Livingston, New Jersey. Savings, now known as First Federal Savings and Loan Association of Toledo, was one of AMC's customers. AMC and Savings transferred to one another large quantities of government securities by means of repurchase agreements, three of which are at issue here.
 
 
 3
 The nature of repurchase agreements and their importance in financing the national debt have been discussed extensively in two previous opinions. In re Bevill, Bresler & Schulman Asset Management Corp., 878 F.2d 742 (3d Cir.1989); In re Bevill, Bresler & Schulman Asset Management Corp., 67 B.R. 557 (D.N.J.1986). Only a brief description is necessary here. A repurchase agreement consists of a sale of government-guaranteed securities for cash and a simultaneous agreement by the seller to repurchase the same securities, or ones of equivalent value, at a later date for a premium above the original price. Typically, the securities are sold for an amount of cash less than their face value. The seller may agree to repurchase the securities the next day, or after some longer period. The premium for repurchase is determined by market forces and is unrelated to the interest rates of the underlying securities.
 
 
 4
 From one point of view, repurchase agreements are nothing more than contracts for purchase and sale of securities. Repurchase agreements have been so characterized for purposes of determining the rights of creditors vis-a-vis the Trustee in these proceedings. In re Bevill, Bresler, 67 B.R. at 598. There is no question, however, that repurchase agreements also closely resemble secured loans, 67 B.R. at 597, in which the buyer of securities lends the seller cash for a brief period, using the securities as collateral. On the date of repurchase, the seller pays back the original loan amount plus a premium that may be regarded as interest. The collateral is returned to the seller.
 
 
 5
 Both parties agree on the material facts. On November 15, 1984, AMC entered into an agreement with Savings under which AMC sold Treasury Bonds, due November 15, 2012, bearing coupon interest of 10.375% and a face value of $1,065,000, to Savings for $934,000 in cash. Simultaneously, AMC agreed to repurchase these securities or their equivalent on February 21, 1985 for $983,197.15. This transaction was reflected in two customer confirmations issued by AMC to Savings, one memorializing AMC's sale of the bonds, the other memorializing AMC's agreement to repurchase. In addition, a separate repurchase agreement was executed. The repurchase agreement stated "Maturing coupons are to be the property of the Buyer," i.e., AMC. Savings paid AMC for the bonds and the bonds were delivered to Savings' custodial account at the SPS Clearing Division of Bradford Trust Company ("Bradford Trust").
 
 
 6
 On January 28, 1985, AMC entered an agreement with Savings under which AMC sold Government National Mortgage Association ("GNMA") Pool No. 69203, bearing an 11.50% interest rate and due July 15, 2013, to Savings for the face amount of $1,000,000. Simultaneously, AMC agreed to repurchase the security or its equivalent on July 26, 1985. Once again, this transaction was reflected in two customer confirmations, one for the sale and the other for the agreement to repurchase. A separate repurchase agreement was executed as well. This agreement stated that "Maturing coupons are to be the property of the Buyer," i.e., AMC. GNMA coupons take the form of monthly principal and interest payments. Savings paid for the security and the GNMA was delivered to Savings.
 
 
 7
 On February 21, 1985, in fulfillment of its obligation to repurchase the Treasury Bonds, AMC paid $983,197.15 to Savings. Savings, however, did not deliver the Treasury Bonds to AMC. That same day, AMC entered into three agreements with Savings under which AMC sold securities in three GNMA pools, Nos. 113007X, 111794X and 12811, carrying a total face value of $1,022,405.40, to Savings for a total of $1,000,000 in cash. According to the terms of this sale, AMC was to keep the securities in a "safekeeping" account at Bradford Trust, rather than delivering the securities to Savings. Although Savings paid AMC for the GNMAs, AMC never delivered the securities to safekeeping. The record shows that AMC did not hold the GNMAs in any account at Bradford. At the same time as this fraudulent sale, AMC agreed to repurchase the securities or their equivalent on August 20, 1985 for a total of $1,047,000 in cash. For each of these transactions, AMC issued two customer confirmations to Savings, one for the sale and one for the agreement to repurchase. Separate repurchase agreements were executed as well.
 
 
 8
 On April 7, 1985, AMC filed a voluntary petition for reorganization under Chapter 11 of the United States Bankruptcy Code. On April 9, 1985, Saul S. Cohen was appointed Trustee. At the time of filing, Savings remained in possession of GNMA Pool No. 69203 and, in addition, retained monthly principal and interest payments on that security amounting to $65,223.33. It also retained possession of the United States Treasury Bonds and coupon interest that had accrued thereon.
 
 
 9
 On October 5, 1987, the Trustee commenced this action under 11 U.S.C. Secs. 541, 542 seeking turnover of property held by Savings. Specifically, the Trustee sought turnover of the $1,065,000 of United States Treasury Bonds and all coupon interest accrued thereon (Count One), $65,223.33 in monthly principal and interest payments on GNMA Pool No. 69203 (Count Two) and coupon interest on $25,000 of United States Treasury Notes, due July 15, 1990 (Count Three). The Trustee later learned that AMC had received the interest payments on the $25,000 Treasury Notes and moved to dismiss Count Three of the complaint. The motion was granted.
 
 
 10
 In its answer, Savings admitted that it held the Treasury Bonds, coupon interest accrued thereon, and the monthly principal and interest payments on the GNMA security. It denied, however, that the bonds, coupon interest, and GNMA principal and interest payments were property of the AMC estate recoverable under section 542 of the Bankruptcy Code. It set up as an affirmative defense its right under section 553 of the Bankruptcy Code to set off the amount of the bonds and interest against a claim Savings had against AMC. The claim consisted of a right to payment for the three pools of GNMA securities which Savings paid for on February 21, 1985 but which AMC never delivered to safekeeping.
 
 
 11
 On November 7, 1988, the Trustee moved for summary judgment. Savings cross-moved for summary judgment, asserting its right of setoff. By opinion dated January 23, 1989, the district court granted AMC's motion for summary judgment and denied Savings' cross-motion. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982). Our scope of review, involving the application of law to undisputed facts, is plenary. United States v. Algon Chemical Inc., 879 F.2d 1154, 1157 (3d Cir.1989).
 
 II.
 
 12
 The turnover provision of the Bankruptcy Code requires an entity that owes a debt that is property of the estate and that is matured, payable on demand or on order, to pay the debt to the trustee. 11 U.S.C. Sec. 542(b) (1988). An exception is made to the extent that the entity has a valid right of setoff, as recognized by section 553. Id. Section 553(a) of the Bankruptcy Code provides:
 
 
 13
 Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case....
 
 
 14
 11 U.S.C. Sec. 553(a) (1988).
 
 
 15
 Section 553 incorporates and preserves in bankruptcy law the right of setoff available at common law. United States v. Norton, 717 F.2d 767, 772 (3d Cir.1983). The equitable right of setoff has long been recognized in bankruptcy, e.g., Libby v. Hopkins, 104 U.S. 303, 26 L.Ed. 769 (1881). The rule allows parties that owe mutual debts to state the accounts between them, subtract one from the other and pay only the balance. The rule is grounded on the absurdity of "making A pay B when B owes A." Studley v. Boylston Nat'l Bank, 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913). However, setoff is at odds with a fundamental policy of bankruptcy, equality among creditors, because it "permits a creditor to obtain full satisfaction of a claim by extinguishing an equal amount of the creditor's obligation to the debtor, i.e., in effect, the creditor receives a 'preference'." In re Braniff Airways, Inc., 42 B.R. 443, 448 (Bankr.N.D.Tex.1984). The provision is permissive rather than mandatory, and cannot be invoked in a case where the general principles of setoff would not justify it. United States v. Norton, 717 F.2d at 772; cf. Cumberland Glass Mfg. Co. v. De Witt, 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915) (construing section 68(a) of the Bankruptcy Act of 1898, the predecessor to section 553).
 
 
 16
 The right of setoff depends on the existence of mutual debts and claims between creditor and debtor. In district court and on appeal, the Trustee argued that Savings did not owe AMC a debt. Rather he claimed that Savings merely held funds as a trustee or bailee for AMC and that such funds were not a "debt" for purposes of setoff. He cited In re Lykens Hosiery Mills, Inc., 141 F.Supp. 891, 893-94 (S.D.N.Y.1956), in which the court wrote:
 
 
 17
 [The setoff] section applies only to those situations where the bankrupt and the creditor owe a debt to one another. It does not include the situation where the bankrupt's property is in the possession of the creditor as bailee or trustee, without color of lien.
 
 
 18
 The logic of the rule is that the trust res is not owing to the bankrupt's estate, but rather is owned by it. In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262, 265 (9th Cir.), cert. denied, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973). The rule is in accord with longstanding Supreme Court precedent. See Libby v. Hopkins, 104 U.S. 303, 26 L.Ed. 769 (1881) (funds held in trust for a particular purpose may not be set off against creditor's claims). Alternatively, the Trustee argued that Savings converted property rightfully belonging to AMC, namely the Treasury Bonds, coupon interest thereon, and GNMA payments. One who converts the property of another is not entitled in equity to a right of setoff. In re Windsor Communications Group, Inc., 79 B.R. 210, 216 (E.D.Pa.1987).
 
 
 19
 The trust argument has considerable force in connection with the coupon interest on the Treasury Bonds and the principal and interest payments on GNMA Pool No. 69203. The repurchase agreements for both these securities specifically stated that maturing coupons would be the property of AMC. Savings had no right to retain these payments under contract. In these circumstances, the reasoning of In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262 (9th Cir.1973), is persuasive. In that case, the debtor's parent corporation received the debtor's tax refund and sought to set off the refund against the outstanding debts owed by the debtor to the parent. The court found that since there was no express or implied agreement that the parent keep the refund, the refund belonged to the debtor. The court concluded that the parent held the funds merely as a trustee and had no right to set off the trust res against its claims. Bob Richards, 473 F.2d at 265. The Trustee's position here is even stronger than in Bob Richards because the parties specified by explicit contractual language that the Treasury Bond coupon interest and the GNMA principal and interest payments would be the property of AMC. In these circumstances, Savings is merely a trustee holding the funds for AMC. Since AMC is the true owner of the trust res, Savings owes AMC no debt.
 
 
 20
 The same cannot be said for the Treasury Bonds. AMC sold the bonds to Savings on November 15, 1984 for $934,000. By the terms of that agreement, AMC was to deliver the bonds to Savings' possession. Further, AMC agreed to repurchase the Treasury Bonds, or their equivalent, on February 21, 1985 for a specified sum. Savings reserved the right to hypothecate the Treasury Bonds in the intervening period. In these circumstances, it cannot be said that AMC owned the Treasury Bonds. Nor did Savings' failure to deliver the bonds or their equivalent on February 21 invest AMC with rights of an owner sufficient to hold that a bailment had been created, that a constructive trust should be imposed or that a conversion had occurred.
 
 
 21
 The repurchase agreement did not create a bailment because AMC did not require return of identical property, but merely property of equivalent value. See Guidry v. Continental Oil Co., 350 F.2d 342, 345 n. 10 (5th Cir.1965).
 
 
 22
 Nor is this case similar to cases in which courts have imposed a constructive trust. See, e.g., In re Bob Richards Chrysler-Plymouth Corp., 473 F.2d 262 (9th Cir.1973). Unlike the debtor in Bob Richards, AMC agreed that the creditor, Savings, would take possession of the Treasury Bonds in return for cash payment. Savings, not AMC, is the owner of the bonds. It is true Savings breached its contractual duty to return the bonds on February 21, 1985. The proper remedy for breach of contract, however, is an award of damages at law, not the equitable remedy of constructive trust.
 
 
 23
 Lastly, with respect to the Treasury Bonds, this case is quite different than the cases cited by the Trustee in which a creditor was held to have converted the debtor's property. For example, in In re Windsor Communications Group, Inc., 79 B.R. 210 (E.D.Pa.1987), the debtor, Windsor, delivered paperstock to Havertown Printing Company for manufacture into greeting cards. Windsor agreed to pay for Havertown's manufacturing services. When Windsor fell behind in its payments, Havertown sold the paperstock to others and applied the proceeds to Windsor's accounts. An involuntary petition was subsequently filed against Windsor. In a suit by the trustee seeking turnover of the paperstock, the court held that Havertown had converted Windsor's paperstock and was not entitled to a right of setoff under section 553. AMC, unlike Windsor, delivered property to a creditor in return for payment in cash. The creditor thereby became the rightful owner of the property. It is true that Savings was under a contractual obligation to resell the Treasury Bonds. None of the cases cited by the Trustee, however, hold that conversion occurs where one party breaches its contractual obligation to the other.
 
 
 24
 The district court held, in agreement with the Trustee, that Savings' contractual obligation to return the Treasury Bonds was not a debt for purposes of setoff. It did not rely on concepts of constructive trust or conversion, however. Instead, it held that Savings' contractual obligation to return the Treasury Bonds was not a "debt" within the meaning of the setoff provision. App. at 18. This was error. It is clear that contractual obligations are debts for purposes of setoff. See, e.g., In re North Atlantic & Gulf S.S. Co., 204 F.Supp. 899, 911 (S.D.N.Y.1962), aff'd sub nom. Schilling v. A/S D/S Dannebrog, 320 F.2d 628 (2d Cir.1963); In re Energy Coop. Inc., 814 F.2d 1226, 1232-33 (7th Cir.), cert. denied, 484 U.S. 928, 108 S.Ct. 294, 98 L.Ed.2d 254 (1987) (creditor failed to deliver oil to debtor under oil exchange contract; held that this debt could have been offset against creditor's claim for payment due on the exchange agreement); In re Argus Indus., 443 F.2d 1255, 1259 (9th Cir.1971) (creditor's failure to deliver goods to the debtor as required by contract is a debt that may be offset against creditor's claim for payment on the contract).
 
 
 25
 We conclude that Savings owed a debt to AMC to the extent that it failed to deliver the Treasury Bonds, or their equivalent, as required by contract. Savings was merely a trustee, however, with respect to the coupon interest on the bonds and the principal and interest payments on GNMA Pool No. 69203. Savings' possession of the interest payments does not constitute a mutual debt for purposes of setoff.
 
 
 26
 Having concluded that Savings owed a debt to AMC, the question arises whether Savings has a valid claim against which to offset the debt. On February 21, 1985, AMC by contract undertook (1) to deliver three GNMA securities to a safekeeping account in return for cash payment and (2) to repurchase the securities on August 20, 1985 for cash. AMC breached the first of these contracts when it failed to deliver the GNMAs to safekeeping. Savings thus had a valid pre-petition claim based on breach of contract. Although this claim had not been reduced to judgment on the filing date, it is nonetheless a valid claim, see 11 U.S.C. Sec. 101(4) (1988), eligible for setoff under section 553. We note that the Trustee in his brief writes that he has already recognized and allowed Savings' claim, on which Savings would receive a 55 percent dividend in the absence of a setoff. Appellee's Brief at 10.[1]
 
 
 27
 We must consider next whether the debt and claim are "mutual" for purposes of setoff. The leading treatise states, "To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity." 4 L. King, Collier on Bankruptcy p 553.04 at 553-22 (15th ed. 1979). Application of the principle in this case is straightforward: each party here contracted with the other, each breached a contractual obligation to the other and owes the other as a result. Even the breaches are similar--both AMC and Savings failed to deliver securities to the other, or to safekeeping for the other's benefit, as required by contract. Given the symmetry of obligation between AMC and Savings, we conclude that the debt and claim here are mutual and thus properly subject to setoff under section 553.
 
 III.
 
 28
 Filing a petition for reorganization ordinarily operates to stay the setoff of any debt owing to the debtor. 11 U.S.C. Sec. 362(a)(7) (1988). Section 362(b)(7), however, provides that the filing of a petition in bankruptcy does not operate as a stay of:
 
 
 29
 the setoff by a repo participant, of any mutual debt and claim under or in connection with repurchase agreements that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 741(5) or 761(15) of this title, or settlement payment, as defined in section 741(8) of this title, arising out of repurchase agreements against cash, securities, or other property held by or due from such repo participant to margin, guarantee, secure or settle repurchase agreements;
 
 
 30
 11 U.S.C. Sec. 362(b)(7) (1988).
 
 
 31
 Congress enacted this provision as part of a series of amendments to the Bankruptcy Code, effective in 1984, known as the "Repo Amendments." At the time of enactment, Congress was concerned with the potentially disastrous consequences of a dealer involved in repurchase agreements filing for bankruptcy protection:
 
 
 32
 The effective functioning of the repo market can only be assured if repo investors will be protected against open-ended market loss arising from the insolvency of a dealer or other counterparty in the repo market. The repo market is as complex as it is crucial. It is built upon transactions that are highly interrelated. A collapse of one institution involved in repo transactions could start a chain reaction, putting at risk hundreds of billions of dollars and threatening the solvency of many additional institutions.
 
 
 33
 See S.Rep. No. 65, 98th Cong., 1st Sess. 47 (1983), reprinted in Bankruptcy Law Reports (CCH) No. 95, at 47 (May 5, 1983). Congress was particularly concerned with the effect of the automatic stay and the trustee's avoidance powers on the repo market:
 
 
 34
 The certainty and fluidity needed by professionals on both sides of the transactions is of such importance that one debtor's filing of a petition should not be permitted to impair the functioning of the market as a result of the Code's automatic stay, or have the integrity of contract relationships upset by the Code's avoidance provisions.
 
 
 35
 In re Bevill, Bresler, 878 F.2d at 748 (quoting Bankruptcy Law and Repurchase Agreements: Hearings on H. 2852 and H. 3418 Before the Subcommittee on Monopolies and Commercial Law of the House Comm. on the Judiciary, 98th Cong., 2d Sess. 517 (1984)).
 
 
 36
 The Trustee argues that the exception in section 362(b)(7) does not apply because Savings does not hold the Treasury Bonds "to margin, guarantee, secure or settle repurchase agreements." On the contrary, they argue, Savings has no right to hold the bonds past the settlement date, February 21, 1985. We reject the Trustee's argument since the exception also applies when the debt consists of securities that are "due from a repo participant," that is, Savings, to "settle repurchase agreements." There is no question that the Treasury Bonds were due on February 21, 1985 to settle the November 15, 1984 repurchase agreement. They were never delivered and remain due to this day. The Trustee also argues that the exception applies only to open repo transactions; that the Treasury Bond transaction is not open because the settlement date is long past. We reject this argument as well. The repo remains open where, as here, one party has not delivered securities as agreed. In this case, it makes no difference that the settlement date is past.
 
 
 37
 The question remains, however, whether Savings' claim against AMC constitutes a claim for a margin payment[2] or a settlement payment.[3] We are greatly aided by our recent decision in In re Bevill, Bresler, 878 F.2d 742 (3d Cir.1989), which adopted a broad interpretation of "settlement payment." That case held that "settlement payment" as defined in section 741(8) includes the deposit or transfer of securities by a dealer (AMC) to a purchaser like Savings. In re Bevill, Bresler, 878 F.2d at 752. It concluded that AMC's deliveries of securities to purchasers, as part of so-called "deliver-out" repos, were settlement payments and thus, under 11 U.S.C. Sec. 546(f) (1988), not subject to the trustee's avoidance powers. We have little doubt that the prior panel would have concluded that transferring securities to a safekeeping account for a purchaser is also a settlement payment. "[A] 'settlement payment' may be the deposit of cash by the purchaser or the deposit or transfer of the securities by the dealer, and ... includes transfers which are normally part of the settlement process, whether they occur on the trade date, the scheduled settlement day, or any other date in the settlement process for the particular type of transaction at hand." In re Bevill, Bresler, 878 F.2d at 752 (emphasis added).
 
 
 38
 The prior decision construed section 546(f), which makes an exception to the avoidance powers, not section 362(b)(7), which we must apply here. We have no hesitation in concluding the prior panel's interpretation of "settlement payment" is equally applicable to this case. The exceptions to the trustee's avoidance powers and the automatic stay were enacted for the same purpose: to insure the liquidity of repurchase agreements and thus the stability of the repo market. There is no reason, therefore, to apply a different interpretation in the context of the stay. We hold that AMC's obligation to deliver the GNMAs to safekeeping was an obligation to make a settlement payment; that, therefore, Savings' claim is a claim for a settlement payment arising out of a repurchase agreement, within the meaning of 11 U.S.C. Sec. 362(b)(7). The automatic stay, therefore, does not prevent Savings from exercising a right of setoff.
 
 IV.
 
 39
 Finally, the Trustee argues that Savings had unclean hands and thus equitable principles favor denying a right of setoff to Savings. We disagree. AMC is the culpable party here, having taken money from Savings in return for a promise to deliver GNMAs which AMC did not own. We see no equitable reason for denying Savings a right of setoff in these circumstances.
 
 
 40
 The judgment of the district court will be affirmed in part and reversed in part. The principal and interest payments on GNMA Pool No. 69203 and the interest coupons on the United States Treasury Bonds do not constitute mutual debts subject to setoff. The United States Treasury Bonds are subject to setoff. Each party to bear its own costs.
 
 
 
 [1]
 At oral argument, Savings maintained that the second contract to repurchase the GNMAs on August 20, 1985 also gives rise to a pre-petition claim. Savings reasoned that since the Trustee has not yet assumed or rejected the contract, he must be deemed, three years after commencement of the case, to have rejected the contract. Under 11 U.S.C. Sec. 365(g) (1988), rejection creates a pre-petition claim for breach of contract
 The mere passage of time, however, does not operate as a rejection of an executory contract in this case since, under Chapter 11, the Trustee may assume or reject an executory contract any time before confirmation of the plan. 11 U.S.C. Sec. 365(d)(2) (1988). There is no indication in the record that a plan for reorganization has been confirmed.
 
 
 [2]
 According to the Code:
 "margin payment" means payment or deposit of cash, a security, or other property, that is commonly known to the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency;
 11 U.S.C. Sec. 741(5) (1988). The Code provides an additional definition:
 "margin payment" means payment or deposit of cash, a security, or other property, that is commonly known to the commodities trade as original margin, initial margin, maintenance margin, or variation margin, including mark-to-market payments, settlement payments, variation payments, daily settlement payments, and final settlement payments made as adjustments to settlement prices;
 11 U.S.C. Sec. 761(15) (1988).
 
 
 [3]
 "settlement payment" means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade;
 11 U.S.C. Sec. 741(8) (1988).