In re Frank A. CALDERONE, d/b/a Frank A. Calderone Construction and Sandra A. Calderone, Debtors.

Frank A. CALDERONE, d/b/a Frank A. Calderone Construction, Plaintiff,

v.

Frank MANCINO and Marian Mancino, Defendants.

Bankruptcy No. 93–21736–BM.
Adv. No. 93–2403–BM.

United States Bankruptcy Court,
W.D. Pennsylvania.

April 29, 1994.

**826**

Patricia L. Blais, Law Offices of Daniel J. Gates, P.C., Pittsburgh, PA, for plaintiff.

Robert A. Galanter, Phillips and Galanter, P.C., Pittsburgh, PA, for defendants.

### *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

Debtor Frank A. Calderone, doing business as Frank A. Calderone Construction (hereinafter "debtor"), has brought this adversary action against Frank Mancino and Marian Mancino (hereinafter "defendants")

for breach of contract. He seeks to recover a final payment of $20,000.00 for constructing a residential dwelling for defendants plus an additional sum of $5,324.61 for "overages" incurred therein.

Defendants have conceded that debtor is entitled to a nominal amount for "overages" but steadfastly deny that he is entitled to the final payment of $20,000.00 because he breached the contract by refusing to complete the project. They seem to aver that as debtor never completed the project that he had no entitlement to the final payment and, therefore, said final payment held by the bank never became estate property. As they have ultimately fulfilled debtor's incomplete task, defendants continue, they have a right to the *res.*

Defendants further assert that they have suffered damages as a result of debtors' various breaches which considerably exceed the amount to which debtor is entitled in "overages". They seek to set off the amount due and owing to debtor against a portion of their damages and have counterclaimed for a monetary judgment in their favor for the balance thereof.

In accordance with the reasoning set forth below, debtor's request for a monetary judgment in his favor will be denied in its entirety. Additionally, defendants will be permitted to set off the amount to which debtor is entitled for "overages" against a portion of their damages which result from debtor's breach of the contract. Defendants' counterclaim for a monetary judgment in their favor for the remainder of their damages, however, will be rejected.

–I–

### FACTS

Debtor is an architect and a contractor who hold himself out as an expert in the construction of single-unit residential dwellings. He avers he has designed approximately fifty (50) and has constructed approximately twenty (20) such units.

Defendants had been having problems with a contractor building another home for them and retained debtor in 1986 to complete the project. Defendants were satisfied with

debtor's performance in connection with that project.

Several years later, defendants decided to have another home built. They ultimately retained debtor to construct a dwelling which debtor had designed for them.

On April 28, 1992, debtor and defendants executed a document entitled "Form Of Agreement Between The Owner And Contractor", wherein debtor agreed to construct a two-story single-unit residential dwelling for defendants. The contract price was $200,000.00.

Work on the project was to commence within fourteen (14) days of the signing of the agreement or approval by the lending institution financing the construction. The project was to be completed "approximately by 180 days ... from commencement (weather permitting) and no unforseen delays". The agreement contained the following provision:

All time limits in the Contract Documents are of the essence of the Contract.... If the Contractor is delayed at any time in progress of the work by.... causes beyond the contractor's control, then the contract shall be extended for a reasonable commensurate period of time equal to the delay without further compensation.

Other documents also were executed at the same time and were integrated into the above agreement.

For instance, a document entitled "Allowance Schedule" provided that the total contract price of $200,000.00 included an allowance of $29,236.00 for certain specified fixtures which defendants were to select from vendors of their own choosing. The identified items included: kitchen cabinets; appliances; lighting and plumbing fixtures; carpets; ceramic tile; mirrors; draperies; landscaping; and security system. Any amount in excess of the total allowance was to be paid by defendants out of their own pocket and was not included in the contract price. If the total amount was less than $29,236.00, the difference was to be refunded to defendants.

On June 15, 1992, after the lending institution from whom defendants obtained financing had approved the above agreement, debtor and defendants executed a document entitled "Construction Agreement" wherein debtor again agreed to construct the above dwelling for defendants for the price of $200,-000.00. This latter document provided that debtor was to be paid according to the following schedule:

| | |
|---|---:|
| Foundation completed | $ 20,000.00 |
| Raised and sheathed | 40,000.00 |
| Rough plumbing, heating and roofing | 36,000.00 |
| Brickwork, siding and roofing | 36,000.00 |
| Plastering, concreting | 20,000.00 |
| Trimmed out and tile work | 28,000.00 |
| Completed | 20,000.00 |
| | $200,000.00 |

Work on the project commenced on June 29, 1992, when debtor began digging trenches for the footers.

According to the time frame set forth in the initial agreement, the project should have been completed by no later than December 26, 1992. Debtor repeatedly assured defendants that "they would be in their new home by Christmas". These assurances were without any foundation, as the project was beset with significant delays.

For instance, excavation of the lot and the laying of the footers fell well behind schedule. Only the footers and a few rows of concrete blocks were in place approximately six (6) weeks after debtor began the project. Nothing further had been done. Only the foundation and the shell of the house had been erected by October of 1992. The plumbing, electrical wiring, heating, brickwork, roofing, plastering, and tile work had not yet commenced.

During the course of construction, defendants exceeded the scheduled allowance of $29,236.00 by ordering more expensive fixtures.

Defendants were not able to move into the dwelling at the end of December of 1992, as provided for under the contract, due to several untold delays. The bricks on the exterior of the dwelling had not yet been laid and much of the interior had not been finished by then.

On March 30, 1993, more than ninety (90) days after the anticipated completion of the

project, defendants finally moved into the dwelling. A considerable portion of the work remained to be completed when they moved in. For instance, only one of the entrances to the dwelling had been completed. Debtor had not built the deck provided for in the drawings; had not completed the concrete work; and had not installed a storm pit to collect water draining off the roof which complied with municipal regulations. In addition, the window grills and screens and air conditioner had not been installed.

Debtor had been paid a total of $180,000.00 of the contract price by April of 1993. He had not, however, been paid the final payment of $20,000.00 which was due upon completion of the project.

On April 17, 1993, debtor sent a letter to defendants demanding payment in the amount of $4,111.83 for "overages". According to debtor, he needed the payment in order to complete the project. He asserted that it was "imperative" that he be paid in full for "overages" so that he could "continue to complete your home". At trial defendants averred this action was "good business".

When debtor's demand for payment went unheeded, he did not seriously attempt to complete the project. Debtor did not show up for several days at a time. When debtor did show up, he would leave shortly after arriving.

On April 20, 1993, defendants sent a letter to debtor wherein they complained about substandard workmanship on debtor's part. Attached to the letter was a "punchlist" of work remaining to be done. Defendants also threatened to take "whatever action is necessary" if debtor did not respond in a satisfactory manner within seven (7) days.

Instead of completing the project, debtor sent defendants an angry letter on April 27, 1993 in which he took umbrage with the contents of their previous letter.

Before they had received debtor's response, defendants sent a letter to debtor on April 28, 1993, wherein they informed debtor that he was "off the job and not allowed to enter out property" and that they would "contract with others" to complete the job. Debtor did not respond to this letter.

On May 4, 1993, defendants' attorney sent a letter to debtor informing him that they had brought suit against debtor and that he had advised defendants to hire another contractor to complete the job. Defendants brought an action in state court that same day for breach of contract.

Subsequent to their dismissal of debtor, defendants hired other contractors to complete work debtor had not done. For instance, a deck substantially similar to the one specified in the plans was built. The window grills and screens and the central air conditioning unit were installed. The rough grading provided for in the contract was done.

Defendants also undertook to repair and correct debtor's slipshod and defective work. For instance, the storm pit was brought into conformity with local codes; leaks in the roof and gutters were repaired; all of the windows and exterior doors were re-caulked; an exterior beam in the garage was welded into place; exterior brick was cleaned; interior moldings and panels were re-stained because their colors did not match; plaster was repaired; the doorbell and light switches were repaired; and glass windows on doors were replaced because they were scratched. This list is illustrative only and is not all-inclusive.

Defendants spent a total of $26,538.16 to complete the project and to correct deficiencies in the work debtor had done.

The matter does not end there, however. Defendants claim that certain deficiencies in debtor's workmanship remain to be remedied and assert that it will cost an additional sum of $25,257.85 to do the work.

On May 14, 1993, debtor and his wife filed a voluntary joint chapter 11 petition at Bankruptcy No. 93–21763–BM. Defendants are listed in Schedule F as having a disputed general unsecured claim in an unknown and unliquidated amount.

An order was issued on June 3, 1993 which notified all creditors that the deadline for filing a proof of claim was September 27, 1993. The order contained the following language:

> **PROOF OF CLAIM** ... Creditors whose claims are not scheduled or whose claims are listed as disputed, contingent, or unliquidated as to amount and who wish to participate in the case or share in any

distribution must do so by the deadline set forth above ...

Defendants did not file a proof of claim by September 27, 1993 and to date have not done so.

On August 27, 1993, one (1) month prior to the bar date for filing proofs of claim, debtor brought the above-captioned adversary action. Defendants answered the complaint and asserted the right to set-off and counterclaimed on October 7, 1993.

The final payment of $20,000.00 provided for in the schedule of payments and which debtors seek to recover was placed in an interest-bearing escrow account pursuant to agreement of the parties on December 10, 1993. The escrow agent will distribute the funds to the prevailing party in this adversary action.

Debtors' second amended disclosure statement was approved on March 17, 1994. Their second amended plan of reorganization, which has yet to be confirmed, proposes paying identified general unsecured creditors between eighteen (18) and forty-three percent (43%) of their allowed claims over a seventy-two (72) month period. The exact percentage paid depends on the amounts recovered by debtor in two lawsuits, one of which is the present adversary action.

Debtors' proposed plan identifies all general unsecured creditors to whom distribution is to be made and the allowed amounts of their claims. No distribution to defendants is contemplated under the proposed plan, as they have not filed a proof of claim and as they are not included in the plan's list.

Trial of debtor's complaint and defendants' set-off and counterclaim was conducted on April 13th and 14th of 1994. Both sides were given an opportunity to offer evidence on controverted issues.

–II–

## ANALYSIS

As has been indicated, debtor asserts in the complaint that defendants breached the above contract by:

(1) refusing to pay the sum of $5,234.61 in addition to the contract price of $200,-000.00 for allowance "overages"; and

(2) refusing to authorize payment of the final installment of $20,000.00 of the contract price for their house.

Defendants admitted at trial that an outstanding balance is due and owing to debtor for "overages". They deny, however, that debtor is entitled to the final payment of $20,000.00. According to defendants, debtor breached the contract by refusing to complete the project and by doing inferior and substandard work.

### A) *Allowance Overage.*

The allowance schedule executed on April 28, 1992 provided that defendants could select certain fixtures costing up to $29,236.00 and that they would pay debtor out of their own pocket for any amount in excess of the allowance.

In light of defendants' admission that they exceeded their allowance, all that remains to be determined with respect to the issue of "overages" is the precise amount thereof. Debtor claims that the amount is $5,234.61. Defendants aver that it is $3,252.98.

As plaintiff in this matter, debtor undoubtedly has the burden of proving with reasonable precision the amount of damages. Debtor has not, however, met his burden. His account of how he arrived at the sum of $5,234.61 was obtuse and unsubstantiated. Defendants' admission at trial that the amount of "overages" is $3,252.98 provides the most reasonable basis for determining the precise amount to which debtor is entitled in this regard.

### B) *Final Payment Of Contract Price.*

■ Debtor is not entitled to the final payment of $20,000.00 because he breached the contract by refusing (or failing) to complete the project. Debtor shall not be paid for tasks he refused to perform.

The payment schedule set forth in the agreement of June 15, 1992 specifically provided that debtor was entitled to the final payment of $20,000.00 **after** he had completed all of the work required under the contract.

Debtor admitted at trial that he had run out of money by March or April of 1992 and

therefore was not able to complete the project. That is why he sent the letter of April 17, 1992 demanding payment at that time for "overages". Despite defendants' repeated requests after they had moved into their residence on March 30, 1993 that debtor return and complete the project, he did not do so. Defendants did **not** prevent debtor from completing the project by discharging him on April 28, 1993. He had stopped working of his own accord prior to then and had no intention of returning to complete the project.

Defendants' refusal to pay debtor in April of 1992 for "overages" did not excuse debtor from completing the project before receiving the final payment. To the contrary, completion was a condition precedent to said payment.

### C) *Defendants' Set–Off And Counterclaim.*

■ Defendants have asserted a right to set off any amount to which debtor is entitled—the sum of $3,252.98 in this instance—against the damages they have suffered as a result of debtor's breach of the contract. In addition, they have counterclaimed for a monetary judgment in their favor for the amount of their damages which exceeds the amount of the allowed set-off. In so doing, defendants seek an affirmative monetary recovery which they evidently hope to have satisfied, at least in part, from the bankruptcy estate *res.*

Defendants' undoubtedly have suffered damages in excess of $3,252.98 as a result of debtor's failure to complete the project and his failure to perform in a workmanlike manner. To say that debtor's work product was of poor quality would be an understatement. Although they will be permitted to set off the amount due and owing to debtor for "overages" against their damages, their counterclaim for an affirmative monetary judgment for the portion of their damages which exceeds the allowed set-off must be **rejected** in light of the circumstances of this case.

As has been indicated, debtors scheduled defendants as holders of a **disputed** general unsecured claim in an unliquidated amount. For reasons that are known only to defendants or their counsel, defendants did not file a proof of claim in this case.

A creditor whose claim has been scheduled as disputed, contingent, or unliquidated must file a proof of claim by the bar date. Any such creditor who fails to do so shall **not** be treated as a creditor with respect to that claim for purposes of voting and distribution in a chapter 11 proceeding. *See* Federal Rule Of Bankruptcy Procedure 3003(c)(2).

■ The language of this rule is clear and unequivocal and has been construed as meaning what it says. *See In re Vertientes, Ltd.,* 845 F.2d 57, 60 (3d Cir.1988). The holder of a disputed claim who fails to file a timely proof of claim is deemed not to have a claim against the chapter 11 estate and, accordingly, is not entitled to any distribution under the plan of reorganization. *See In re Nutri\*–Bevco, Inc.,* 117 B.R. 771, 778 (Bankr. S.D.N.Y.1990). Any prepetition claim defendants in this case may have against debtor will be extinguished when a discharge is granted. *See In re G.S. Omni Corp.,* 835 F.2d 1317, 1318–19 (10th Cir.1987).

The above general rule does not apply to such a creditor when it merely asserts a right of set-off. A holder of a disputed claim who fails to file a timely proof of claim need not file a proof of claim as a prerequisite to asserting set-off pursuant to 11 U.S.C. § 553. *See In re G.S. Omni Corp.,* 835 F.2d at 1318.

The reason for this has to do with the nature of set-off. A creditor asserting set-off is **not** requesting distribution from the bankruptcy estate *res* but is seeking instead to satisfy the debt owed to it by debtor to the extent of the debt it owes to debtor.

Set-off permits parties to "net" their respective obligations. *See In re IML Freight, Inc.,* 65 B.R. 788, 791 (Bankr.D. Utah 1986). Parties owing mutual debts to one another are permitted by set-off to state the accounts between them, **to subtract the one from the other,** and to pay only the balance. *See Matter of Bevill, Bresler & Schulman Asset Management,* 896 F.2d 54, 59 (3d Cir.1990). Set-off is grounded on avoiding the absurdity of "making A pay B when B owes A". *Id. (citing Studley v. Boylston National Bank,* 229 U.S. 523, 528, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913)).

Defendants also have "counterclaimed" for a monetary judgment in their favor for the balance of their damages in excess of the amount of the allowed set-off. In so doing, defendants request an affirmative recovery and evidently seek to share in the distribution of estate assets. As has been noted, Federal Rule of Bankruptcy Procedure 3003(c)(2) unequivocally prohibits such relief when the creditor has a disputed claim and has not filed a timely proof of claim. Accordingly, there is no need to determine the amount, if any, of defendants' counterclaim.

Although this outcome at first blush may seem to be hypertechnical and unduly harsh to defendants, further reflection indicates that it is neither.

Rule 3003(c)(2) is more than a "mere technicality" intended to trip up the uninitiated or the unwary. It is designed to facilitate the orderly and expeditious administration of the bankruptcy estate. Permitting a creditor with a disputed claim who has not filed a timely proof of claim to participate in distribution would undermine this important objective.

Moreover, the outcome is not as severe in this case as it would first seem. The final payment of $20,000.00 which debtor sought (albeit unsuccessfully) to recover had been placed in an interest-bearing escrow account and is to be released to the party who prevails on that issue. Defendants will benefit to the extent of $20,000.00 in light of the above determination that debtor is not entitled to the funds, which undoubtedly will be paid directly to defendants or to their mortgagee.

Assuming, for the sake of argument, that defendants suffered approximately $50,000.00 in damages, as they claim they did, this sum constitutes forty percent (40%) of their alleged damages. This is greater than what general unsecured creditors, which is what defendants claim to be, can expect to receive under debtors' proposed second amended plan of reorganization.

As has been noted, debtors anticipate that general unsecured creditors will receive a *pro rata* distribution of between eighteen percent (18%) and forty-three percent (43%) of their allowed claims, depending on the outcome of this adversary action and another adversary action. The determination that debtor is not entitled to any monetary judgment in his favor in this adversary action almost surely means that distribution to general unsecured creditors will be considerably less than forty percent (40%) of their allowed claims. Should debtor not prevail in the other adversary action, which is still pending, the strong possibility exists that general unsecured creditors will receive at most an eighteen percent *(18%) pro rata* distribution.[1]

An appropriate order shall be issued.

### ORDER OF COURT

AND NOW at Pittsburgh this 29th day of April, 1994, in accordance with the accompanying Memorandum Opinion, it hereby is **ORDERED, ADJUDGED** and **DECREED** as follows:

(1) plaintiff debtor Frank A. Calderone's request for a monetary judgment in his favor is **DENIED;** and

(2) the request of defendants Frank Mancino and Marian Mancino for a monetary judgment in their favor on their counterclaim is **DENIED.**

---

1. As the final draft of this memorandum opinion was being prepared, debtors filed a motion to convert to chapter 7 in which they aver an inability to consummate any plan of reorganization.

   Debtors' schedules suggest that little, if anything, will be available in a chapter 7 distribution with which to pay general unsecured creditors. It is a virtual certainty that general unsecured creditors, if they receive any distribution at all, will not receive even as much as eighteen percent (18%) of their allowed claims.

This expectation reinforces the conclusion that the above outcome is not unduly harsh to defendants. In light of the rejection of debtors' attempt to recover the final payment of $20,000.00, defendants will receive approximately forty percent (40%) of the total damages they **allegedly** suffered. A considerable portion of these alleged damages were incurred in completing the project when debtor did not do so.