OUR LADY OF THE SEA CORPORATION & others[1] *vs.*
JOAO P. BORGES.

No. 94-P-231.

Essex. January 17, 1996. - May 29, 1996.

Present: BROWN, KAPLAN, & LAURENCE, JJ.

*Contract,* Damages, Loan, Unjust enrichment. *Damages,* Loss of profits.
*Limitations, Statute of. Negotiable Instruments,* Note, Payment. *Fiduciary.*

In a civil action seeking recovery for lost profits on account of misappropriation of corporate assets by a partner in a business venture, the plaintiffs proved their loss with reasonable certainty and the judge's calculation of damages was not demonstrated to be erroneous. [487-490]

In an action brought in 1987 on two promissory notes created in 1979, the judge correctly concluded that the debtor's partial payment on one of the notes in 1984 tolled the running of the six-year statute of limitations on both notes in circumstances in which he found that the notes were given by the debtor to his two business partners in an essentially unitary transaction as his contribution to the venture's capital account and the partial payment was an acknowledgement of the existence of the whole debt. [490-492]

At the trial of a civil action seeking damages for misappropriation of corporate assets, the judge correctly ruled that the defendant could not offset a debt owed him by the corporation against the damages awarded to the corporation on account of his breach of fiduciary duty, where in the circumstances that would result in the defendant's unjust enrichment. [493-494]

CIVIL ACTION commenced in the Superior Court Department on February 4, 1987.

The case was heard by *Barbara J. Rouse,* J.

*William D. Gardiner* for the defendant.

*Thomas J. Flannagan (Patrick J. Riley* with him) for the plaintiffs.

BROWN, J. The Our Lady of the Sea Corporation (OLSC)

_____

[1]Antonio Pata and John Pata.

was formed by four individuals interested in purchasing and operating a commercial fishing vessel out of the Gloucester area. Two of the parties, the brothers Antonio and John Pata, claimed that Joao Borges, their partner and the captain of the vessel, secretly misappropriated large amounts of the vessel's catch and fuel rebates (corporate assets) and defaulted on five separate loan agreements made in connection with the fishing venture and an unrelated venture. In his counterclaim, Borges demanded an accounting of the corporate assets, damages for his improper ouster from the corporation, and payment on a promissory note given him by OLSC.

The action was tried jury-waived in the Superior Court.[2] The judge found for OLSC on the misappropriation claims, awarding damages in the amount of $396,591.50; for John Pata on the claim seeking collection on a note in the amount of $12,500; for Antonio Pata for $7,500, on the claim seeking collection on a note in the amount of $12,500 (minus a $5,000 payment); for Borges on John Pata's demand for the return of $5,000 loaned by oral agreement; for Borges on the Patas' claims seeking collection on two notes in the amount of $7,500 given with respect to an unrelated venture; and for the defendants in counterclaim.[3]

The judge issued a comprehensive decision to accompany her order for judgment. The relevant facts are taken from the parties' stipulation of facts and from the judge's findings of fact.

Interested in forming a commercial fishing venture, the Patas, neither of whom had any experience in the business, approached Borges, a skilled fishing captain. Together with a fourth individual, the parties agreed to construct and manage a vessel, which they called Our Lady of the Sea.

To finance the venture, each of the four original shareholders of OLSC contributed $25,000 toward the venture, putting

---

[2]In addition to live testimony, there was a stipulation and an agreement to certain facts.

[3]The plaintiffs have not appealed. Although Borges appealed from all judgments entered against him, his appellate argument is limited to a challenge to (1) the amount of damages awarded, (2) the ruling that the statute of limitations did not bar John Pata's action on the $12,500 note, and (3) the ruling that his breach of fiduciary duty precluded him from recovering the amounts he had lent to the corporation. The remainder of his claims, therefore, are deemed waived, See Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975); *Forbush* v. *Lynn*, 35 Mass. App. Ct. 696, 698 n.4 (1994).

$5,000 in for stock and taking a $20,000 note back. Because he did not have the capital for the shareholder's contribution, Borges borrowed $12,500 from each of the Pata brothers, executing promissory notes dated March 1, 1979, to Antonio and April 5, 1979, to John. The shareholders personally guaranteed the bank loan taken out by OLSC for the purchase of the vessel, securing the loan with mortgages on their homes.

In connection with an unrelated fishing venture, Borges subsequently borrowed $7,500 from each brother, executing notes on June 30, 1979.

As part of a buy-out deal with the fourth stockholder in July, 1982, Borges lent the corporation $20,000 to buy back that shareholder's stock. Borges had borrowed the $20,000 from Ocean Crest Seafoods, Inc. (Ocean Crest), a company that regularly purchased its fish from OLSC. At this point, Borges and the Patas each owned one-third of the stock in the corporation.

On October 3, 1983, each shareholder lent an additional $20,000 to OLSC. On January 4, 1984, Borges made a partial payment to Antonio Pata in the amount of $5,000 toward his $12,500 obligation, promising to repay both brothers the full amount borrowed.

Our Lady of the Sea embarked upon its maiden voyage on September 10, 1979. During the time that Borges was captain of the vessel, it would dock after each fishing trip; longshoremen would unload and separate the fish by species; and employees of Ocean Crest would weigh the fish, fill out a tally sheet, and multiply the weight of each species by the market rate to determine how much was owed. As wages, the longshoremen and crew received a percentage of the value of the catch based upon the weight and species; and, in accordance with industry practice, Borges received a ten-percent captain's share of the revenue in addition to his crew share. After deductions were taken for wages, any remaining amount represented OLSC's income.

Not satisfied with his share, Borges secretly arranged with the management of Ocean Crest to skim a certain amount of fish from the total catch on each trip. Ocean Crest agreed to divert the fish for Borges's benefit in exchange for a twenty-percent reduction in the market price of the fish. The scheme worked in this manner. As the vessel pulled in with its catch,

Borges or his brother Manny would give a signal to Louis Mitchell, an employee of Ocean Crest, to keep a second tally of fish on a separate card. Borges was credited with or paid from $3,000 to $5,000 for each trip.

From September, 1982, to August, 1984, for instance, Ocean Crest credited Borges with payments of $17,325.00 toward the $20,000 he had borrowed from the company in July, 1982.[4]

In 1984 or 1985, the Pata brothers began to suspect that Borges was stealing from them. The longshoremen complained to the Patas that they seemed to be unloading more fish than they were paid for and than appeared on the final fish tally. On two occasions, unbeknownst to Borges, the Patas conducted independent tallies of the catch, and the total was more than the amount credited to OLSC. On October 9, 1986, Borges was injured during a fishing trip and never again served as the captain of Our Lady of the Sea.[5]

In total, Borges served as the captain on 123 trips. During Borges's tenure as captain, Rose's Oil Service, the company from which OLSC purchased fuel, discounted each gallon of the 551,830 gallons of fuel purchased by five or ten cents. On conflicting evidence, the judge found that Borges retained the rebates for himself instead of returning them to OLSC.

On February 4, 1987, at a special meeting of OLSC's directors, the Patas voted to remove Borges from his position as officer and director of OLSC.

1. *Damages.*

a. *Fish misappropriation.* The judge awarded damages in the amount of $369,000 for the misappropriation of fish. Borges argues that this amount is speculative and the product of guesswork, as there was no evidence of the amount, type, and value of the fish allegedly taken. There is no merit to this argument.

A party may recover for lost profits as long as the value of those profits may be determined, as a practical matter, with a fair degree of certainty. *Novel Iron Works, Inc.* v. *Wexler*

[4]The judge explicitly discredited Borges's testimony that these payments came from his captain's share. The judge also implicitly discredited testimony that Borges used the credit from his personal skipper's card to pay off a debt owed to Ocean Crest by OLSC.

[5]In a subsequent lawsuit, Borges recovered $438,000 from OLSC's insurer.

*Constr. Co.,* 26 Mass. App. Ct. 401, 412 (1988). The amount of lost profits may be ascertained by reference to some definite standard, either of market value, established experience, or direct inference from known circumstances. *Ibid.*

Under our well established rules of damages, the amount of damages need not be proved with mathematical precision; the extent of damages often must be left to estimate and judgment. See *Dalton* v. *Demos Bros. Gen. Contractors, Inc.,* 334 Mass. 377, 379 (1956). A tortfeasor may not complain that damages cannot be ascertained with precision when his wrongdoing caused the uncertainty. *McKenna* v. *Begin,* 5 Mass. App. Ct. 304, 311 (1977).

Here, there was overwhelming evidence of Borges's scheme to steal fish from OLSC, his partners, the crew, and the longshoremen. There was evidence that fish were stolen after each trip from September, 1979, to October, 1986; that Ocean Crest was the exclusive fish purchaser during this time; that the skipper's card was paid off "down back"; that Ocean Crest's fish-tallier Louis Mitchell was paid $25.00 per trip to "keep [his] mouth shut"; that everything was done in secret; and that Borges's personal tally sheets were probably destroyed. Borges, therefore, is ultimately responsible for the plaintiffs' inability to calculate damages with precision at this point.

In fashioning a damage award from the conflicting evidence, the judge particularly relied upon the testimony of Mitchell, the tallier present on the docks during the unloading process and probably the person best able to gauge how much fish was stolen. According to Mitchell, the amount and type of fish recorded on Borges's personal card depended on the amount and type of fish caught; Borges was paid twenty percent less than market price for "his" fish; on less successful trips, at least 3,000 pounds of fish were diverted, while on good trips 5,000 to 6,000 pounds were diverted; and Borges and his cohorts chose "big-money" fish such as haddock, which sold for $1.50 per pound at the time. Mitchell, who had significant experience as a fish counter, testified that his estimate of the amount stolen was "not a guess."

The judge estimated that Borges stole $3,000 worth of fish on each of the 123 fishing trips, for a total of $369,000 worth

of converted fish. Although the judge's method of calculation is not apparent on the face of the record, she could have reached the figure of $3,000 by taking the market price of haddock ($1.50), subtracting the twenty-percent discount ($1.50 − .30 = $1.20), and multiplying that by 2,500 pounds of fish, or she could have taken the average of the market price of a "premium fish" such as haddock ($1.50) and a lower priced fish such as pollack ($.50 a pound), or $1.00 a pound, and multiplied that by the minimum average weight of the fish stolen per trip (3,000 pounds). Regardless of methodology, the result reached was a fair estimate supported by the evidence. The plaintiffs have proved their loss with reasonable certainty.[6] See *Agoos Leather Cos.* v. *American & Foreign Ins. Co.*, 342 Mass. 603, 608 (1961).

b. *Fuel rebates.* The judge awarded $27,591.50 to the plaintiff corporation, calculated by multiplying the undisputed number of gallons purchased during Borges's employment (551,830) by the lower (conservative) amount of the rebate per gallon (five cents), rather than the higher figure of ten cents per gallon. Borges argues that this finding is clearly erroneous. In the alternative, he argues that he was entitled to retain the rebate as part of his compensation package agreed to by the parties during preliminary contract negotiations.

There was evidence that Borges, at the beginning of the venture, informed the Patas, who were unfamiliar with industry custom, that all fuel rebates went directly to the captain of the vessel; Borges received the rebates; eventually the Patas discovered, at some point before Borges was injured, that Borges had lied and that fuel rebates customarily were applied toward the expenses of the vessel; and thereafter, the

---

[6]With a fair measure of chutzpah, Borges contends that the plaintiffs are not entitled to a full measure of damages because, under the profit-sharing agreement, the crew and the longshoremen (the same people from whom he originally stole) eventually would have received fifty-five percent of the net profits. As the judge pointed out, permitting such an offset would allow Borges to profit from his theft. Furthermore, just as the revenues would originally have gone to OLSC, which then would have distributed the appropriate shares to the longshoremen and crew members, when the damages are paid to OLSC it can then distribute the appropriate shares to the crew and longshoremen.

Patas made sure that the rebates were credited to the corporation.[7]

There was conflicting evidence as to whether Borges retained all the rebates and whether rebates were given after each trip. Records from the fuel company indicate that some of the rebates were applied to the corporation's repair account. Randi Pata, OLSC's bookkeeper, who prepared preliminary figures for Borges's tax returns (which included figures from Tax Form 1099 statements issued to Borges from the fuel company), testified that Borges retained the rebates for the entire period of his employment; on recross examination she testified that she did not know for sure on which trips he received discounts and on which he may not have, as her knowledge was based on the Form 1099 statements. It appears that, on the conflicting evidence, the judge, in her discretion, credited the Patas' testimony over that of Borges and disregarded certain of the fuel company's records as not being determinative as to who actually received the money. While a lower damage award may have been permissible on this evidence, the judge's award was not clearly erroneous.[8]

2. *Promissory note given to John Pata.*

Both parties agree that Pata's claim is governed by the six-year statute of limitations of G. L. c. 260, § 2. Borges executed the demand note at issue on April 5, 1979. John Pata did not bring the action until February, 1987, outside of the statutory period.[9] The judge ruled, however, that Borges's partial payment of $5,000 to Antonio Pata in January, 1984, tolled the running of the statute "because it was an acknowledgement of the existence of the indebtedness to both Patas and raised an implied promise to repay the balance." Borges contends this was error. Scant analysis was included in the judge's decision on the issue. There is no case law governing this particular situation of one borrower indebted to two re-

---

[7]John Pata testified that he was not really sure when they changed the practice with regard to crediting of rebates, but he thought "it was two or three trips before [Borges] got injured."

[8]As already mentioned, the judge took the conservative figure of five cents per gallon rather than ten cents or some intermediate amount, e.g., an average.

[9]The parties do not argue, nor did the judge conclude, that the cause of action was concealed until 1984 or 1985.

lated creditors under virtually identical circumstances in an essentially unitary transaction.[10]

Here, the judge treated the two separate promissory notes given by Borges as one debt from evidence demonstrating that Borges borrowed one-half of his required original $25,000 shareholder's contribution from each Pata.

As authority for her ruling, the judge relied upon *Boles* v. *Katz*, 340 Mass. 406 (1960). In that case, one creditor maintained three running accounts on behalf of the debtor for several items of materials and labor furnished. All but four of the debtor's payments were made more than six years before the creditor's action was commenced. *Id.* at 407. The court, nevertheless, ruled that these payments made upon the "general account" operated to renew the defendant's entire indebtedness, and therefore, the creditor's action was not barred by the statute of limitations. *Id.* at 407-408. Despite arguably distinguishable features, the underlying principle of *Boles* — that part performance of one of several inextricably interrelated debts tolls the statute of limitations as to them all — is, we think, applicable to the facts of the case before us.

As stated in *Day* v. *Mayo*, 154 Mass. 472, 474 (1891), "[w]here a partial payment is made on account of an existing indebtedness, the whole debt upon which such payment is made is thereby taken out of the statute of limitations up to that time. The identity of the debt sued on with that upon which the payment was made must of course be established. But if it is shown that the payment was made to apply upon an indebtedness consisting of many items, all of them will thereby be saved from the effect of the statute. The payment is an acknowledgement of the existence of the indebtedness and raises an implied promise at that time to pay the balance." Moreover, "where the identity of the debt sued on with the debt on which the payment is made is established,

---

[10]There is statutory and case law governing the converse situation. See G. L. c. 260, § 15; *Leonard* v. *Strong*, 2 Mass. App. Ct. 467, 471 (1974) (part payment by one of two joint debtors did not toll the running of the statute as to the other). Compare *Vermont-Peoples Natl. Bank* v. *Parker*, 269 Mass. 387, 390-391 (1929) (§ 15 does not apply in case of partners, at least where creditor has no notice of dissolution of partnership; holder of collateral could apply it to any of firm's indebtedness). See also *Abele* v. *Dietz*, 312 Mass. 685, 688-690 (1942) (question of fact whether issuance of checks by treasurer of corporation was acknowledgment of own indebtedness as well as corporation's).

such payment will take the whole debt out of the statute, whether it is represented by one note or by more than one note. For instance, suppose a debtor owing a man three thousand dollars, evidenced by three notes of one thousand dollars each, says to the creditor, I owe you this three thousand dollars, I cannot pay you the whole debt, but I now pay you fifteen hundred dollars on account of it. This is clearly an acknowledgement of the whole debt, and would take it out of the operation of the statute of limitations . . . ." *Taylor* v. *Foster*, 132 Mass. 30, 33 (1882).

As stated in 18 Williston, Contracts § 2065, at 928 (Jaeger 3d ed. 1978), "It seems possible . . . for a partial payment to be made with the intent manifested in acts and circumstances if not in words that it should be applied generally on account of the debtor's total indebtedness, although that may be represented by several notes or due on more than one account. If the part payment, under the circumstances, involves such an acknowledgement of the whole indebtedness, all will be revived." In the circumstances of the present case — where the Patas and Borges were joint venturers, where the two notes in question were for loans to Borges for his capital contribution and related to the joint business venture, and where (according to Antonio Pata's testimony) Borges said when he paid Pata the $5,000 that he was going to pay him the rest that he owed him and his brother — the judge's finding and ruling that Borges's partial payment of $5,000 constituted an acknowledgement of the existence of the indebtedness to both and raised an implied promise to repay the balance owed to them and that it therefore tolled the statute of limitations was warranted. See *Taylor* v. *Foster*, 132 Mass. at 33-34; 18 Williston, Contracts § 2065, at 978. Cf. *Vermont-Peoples Natl. Bank* v. *Parker*, 269 Mass. 387, 390-391 (1929) (plaintiff's claim against partner of person who signed renewal of earlier notes of partnership not barred by statute of limitations); *Abele* v. *Dietz*, 312 Mass. 685, 688-690 (1942) (question of fact whether issuance of checks by treasurer of corporation was acknowledgment of own indebtedness as well as corporation's).[11]

---

[11]Briefly, there is no merit to Borges's claim that the judgment on the note was premature in that the claim should be brought in an action to dissolve the corporation. Also, contrary to Borges's contention, John Pata

3. *Borges's breach of fiduciary duty to OLSC.*

In his counterclaim, Borges demanded the return of $20,000 which he had lent to the corporation on July 23, 1982. There was also undisputed evidence that Borges had lent the corporation an additional $20,000 on October 3, 1983.

Focusing on Borges's conduct in the context of his role as an officer and a director of the corporation, the judge ruled that Borges's breach of his fiduciary duty barred him from claiming any portion of the $40,000 allegedly due from OLSC.[12] She also found that neither of the other two partners had been repaid for the loans they had each made for the same amounts at the same times.

Borges contends that, even assuming that he violated the law, the plaintiffs are not entitled to invoke the equitable defense of "unclean hands" because his misconduct was unrelated to his demand for payment of the promissory note; that is, the conduct at issue did not "directly affect the claim being brought." *Amerada Hess Corp.* v. *Garabedian*, 416 Mass. 149, 156 (1993). See also *Flynn* v. *Haddad*, 25 Mass. App. Ct. 496, 506 (1988). Whether or not the doctrine of "unclean hands" applies, we think that the judge acted within her discretion in ruling that Borges's demand for payment was related to his misconduct and that he should not be allowed to offset his note against the damages awarded OLSC. Here, in order to make his first loan of $20,000 to OLSC, which increased his equity (ownership) position in the corporation from one-fourth to one-third, Borges borrowed the $20,000 from Ocean Crest. He subsequently used fish stolen from OLSC to repay the loan made to him by Ocean Crest. He still retains the one-third equity interest in OLSC. The other two partners have not been repaid for the loans they made for the

properly asserted a claim in the complaint demanding payment on the note. Borges's rights *against OLSC* with respect to his initial shareholder's contribution, including the first promissory note given by OLSC, have not yet been litigated.

[12]Although the judge did not explicitly mention the doctrine of unclean hands, the parties base their arguments on the assumption that the judge applied this doctrine to the instant circumstances. Borges contends that this was error because the plaintiffs did not plead the doctrine of unclean hands as an affirmative defense as required by Mass.R.Civ.P. 8(c), 365 Mass. 750 (1974). There is no merit to this claim. While the plaintiffs did not refer explicitly to the doctrine in their answer, the substance of the defense was clearly asserted.

same amounts at the same time. It is unclear whether the corporation will have sufficient assets, after all creditors are paid, to repay those loans to the partners. If the other partners were unable to recover on their notes, to allow Borges, the wrongdoer, to recover on his would result in unjust enrichment. Cf. *Samia* v. *Central Oil Co.*, 339 Mass. 101, 122-123 (1959). In these circumstances, the judge's decision not to offset the note against the damages awarded the plaintiff corporation in this action was warranted.[13]

*Judgments affirmed.*

---

[13]The second $20,000 loan, made in 1983, represented Borges's one-third share of a tax refund, which by agreement of all three partners was immediately used to reduce the mortgage on the boat. Neither Antonio nor John Pata has been repaid for these loans. Because, however, Borges did not demand repayment of this note in the counterclaim and the issue does not appear to have been tried, the judge should not have ruled on it.