### In re FIRST NEW ENGLAND DENTAL CENTERS, INC., Debtor.

DentalNet, inc. F/K/A Boston Dental Group, Inc. and Dr. Charles C. Hur, Appellants,

v.

John J. Aquino, Creditors Trustee, Appellee.

No. CIV.A. 02–12195–WGY.

United States District Court, D. Massachusetts.

March 31, 2003.

Paul D. Moore, Donald F. Farrell, Jr., Duane Morris LLP, Boston, MA, for John J. Aquino.

Timothy J. Burke, Burke & Associates, Braintree, MA, for Charles Hur and DentalNet, Inc.

Joseph D. Kropp, Kline & Gordon, Boston, MA, Joseph A. Gordon, for James H. Chalmers, Jr.

### MEMORANDUM AND ORDER

YOUNG, Chief Judge.

This is an appeal from a memorandum of decision ("the Decision") of the Bankruptcy Court for the District of Massachusetts, dated September 11, 2002.[1] The case arises out of the sale of two dental

---

1. The Decision appears in the Appendix of the Appellants, Volume 1 [Docket No. 6], at page 204.

practices from the debtor, First New England Dental Centers, Inc. ("New England Dental"), to the appellant, DentalNet, Inc. ("DentalNet"), in January 1998.

## I. INTRODUCTION

### A. Cast of characters

It is helpful at the outset to give a summary of the major players in the unfolding drama.

New England Dental is the debtor. Joseph A. Anoli ("Anoli") was its Chief Financial Officer. It purchased two dental practices, located on Newbury Street in Boston and in Watertown, from a Dr. James H. Chalmers, Jr. ("Chalmers") on May 19, 1995. New England Dental subsequently sold two practices (the Watertown practice originally purchased from Chalmers and another practice located in Wellesley) to DentalNet.

Dr. Charles C. Hur ("Hur") is the second appellant, and was the president of DentalNet. John Ward ("Ward") was the Chief Financial Officer of DentalNet, and Jennifer Kim ("Kim") is another person associated with DentalNet.

Dr. Ginny Bang ("Bang") is a dentist who was employed by DentalNet and also worked part-time in one of the practices eventually purchased by DentalNet. Dr Andrea Rohardt ("Rohardt") was the supervising dentist at the Wellesley practice and worked approximately one day per week for New England Dental.

John J. Aquino is the creditor's trustee in New England Dental's bankruptcy.

### B. Facts

On May 19, 1995, Chalmers sold two dental practices to New England Dental,

one located on Newbury Street in Boston, and the other located in Watertown. *In re First New England Dental Ctrs., Inc.*, No. 90–345, slip op. at 4 (Bankr.D.Mass. Aug. 13, 2001) (hereinafter "Mem. of Decision").

New England Dental gave Chalmers a promissory note dated May 19, 1995, for the principal amount of $225,000.00, and entered a security agreement on the same date granting Chalmers a security interest in certain personal property at the two practices. *Id.*

Some time later, Bang—who was employed by DentalNet and also worked part-time in a practice owned by New England Dental in Wellesley—learned that New England Dental was selling the Wellesley practice. *Id.* at 11. It was through this connection that DentalNet learned that the Wellesley practice was up for sale. DentalNet was impressed with New England Dental, which was a large dental firm, and Hur, Ward, and Kim met with representatives of New England Dental in December 1997. *Id.* at 11–12. At that meeting, the representatives of New England Dental told them that the Wellesley practice did not suit New England Dental's business model because it was a small three-chair practice and New England Dental preferred larger practices. *Id.* at 12. New England Dental also informed DentalNet that it wished to sell the Watertown practice it had acquired from Chalmers, as it too did not fit within the business model. *Id.*

New England Dental provided certain financial information to Hur and Ward, containing actual revenue and expense figures for the first ten months of 1997 and projected figures for November and December. These figures showed that New England Dental projected losses for both practices in 1997.[2] *Id.*

---

**2.** These losses were projected to be $66,100.00 for the Wellesley practice and $75,400.00 for Watertown.

Hur and Ward both testified that they were unconcerned about the figures because they anticipated that DentalNet's costs would be substantially less than those of New England Dental. *Id.* at 13. Further, Hur testified that DentalNet specialized in serving patients from Dental Maintenance Organizations ("DMOs") (similar to HMOs). It received capitation fees for each patient referred to DentalNet by a DMO, as well as fees directly from patients in the form of co-payments. *Id.* at 14. Hur also testified that DMO providers generally do not reassign patients from one practice to another, so as to minimize expenditures. *Id.* Hur testified that DentalNet contacted certain DMOs to obtain information on demographics and payments for the two practices and concluded that, if revenues resembled the projections, DentalNet could do well with the practices. *Id.*

DentalNet and New England Dental entered into an Asset Purchase and Sale Agreement, dated December 31, 1997 ("the Agreement") for the acquisition of the assets of both the Wellesley and Watertown practices. *Id.* at 9.[3] Both Hur and Ward agree that the Agreement contemplated the sale of assets only and contained no reference to the practices' revenues. *Id.* at 12. Pursuant to the Agreement, DentalNet agreed to pay $240,000.00 for the assets of both the practices, which consisted of $200,000.00 for equipment and $40,000.00 for goodwill. *Id.* at 9–10. Hur personally guaranteed DentalNet's obligations under the Agreement. *Id.* at 9.

DentalNet paid New England Dental $2,000.00 as a deposit and $34,000.00 at closing. DentalNet issued a promissory note dated January 9, 1998, under which it agreed to pay the balance of $204,000.00, plus interest at 10.25%, in thirty-six monthly installments of $3,413.05 with a final payment of $133,935.42 to be paid at the same time as the last monthly payment. *Id.* at 10.

New England Dental filed a voluntary Chapter 11 petition on February 13, 1998, and Aquino was appointed Chapter 11 trustee on April 8, 1998. *Id.* at 2.

There is some dispute as to whether DentalNet made any payments under the promissory note. Aquino could not find evidence of any payments having been made by DentalNet or Hur after April 8, 1998. *Id.* at 11. Hur and Ward both testified that DentalNet made the first two payments under the promissory note, but DentalNet failed to produce copies of cancelled checks to substantiate this claim. *Id.* Accordingly, on September 14, 1999, Aquino notified DentalNet and Hur that full payment was required within three business days—otherwise all amounts owing would be due immediately and owing without further notice of demand. *Id.*

The Agreement included a clause, ¶ 5.1, which provided that New England Dental must permit DentalNet access to the "properties, books, contracts, commitments, records (including tax records), officers and personnel" of the two practices and that New England Dental provide to DentalNet a copy of "such information concerning the business affairs of the Practices as [DentalNet] may reasonably request in writing." Agreement at 9. The Bankruptcy Court noted that DentalNet did not submit any evidence that it made any such requests. Mem. of Decision at 13.

The actual revenues for both practices turned out to be well short of the projected figures for December 1997. The actual revenue for Wellesley was $4,609, compared to a projection of $21,000, and in

---

**3.** The Agreement appears in the Appendix of the Appellant, Vol. 2 [Docket No. 7] at 313.

Watertown the actual figure was $14,204, compared with a projection of $38,000. *Id.* at 14. Hur testified that the only reason he could imagine for the reduced revenues was a reassignment of patients by the DMO's. *Id.* at 14–15. There was also testimony from Anoli that there was a certain amount of seasonality to the business and that revenues tended to dip around Christmas. *Id.* at 15.

New England Dental was required under the Agreement to continue operating the practices until the closing date (January 9, 1998). *Id.* The evidence as to when the practices were closed was unclear. Rohardt testified that she learned during an office Christmas party that the Wellesley office would be closing in January or February of 1998. *Id.* Anoli testified that he believed the Wellesley practice closed in December and that Watertown also had closed at about that time, but he was unsure of the precise date. *Id.*

The Agreement required New England Dental to provide written notice to all managed care providers associated with the practices within ten working days of the closing date notifying them of the change in ownership. Agreement at 14. New England Dental complied with that requirement. Mem. of Decision at 15.

After the poor early performance of the practices, Hur examined the patient lists and determined that the patient retention rate was abnormally low. *Id.* at 16. It does not appear that Hur examined the patient lists at all prior to the closing date of the Agreement. He testified that he usually had a seventy percent retention rate when he bought practices, although the percentage was around ninety percent with DMO's because insurance companies generally dislike reassigning patients. *Id.* Although not clearly articulated in the Decision, Hur apparently testified that DentalNet was required to reenlist providers

and complete a credentialing program with the DMOs, which took three months. *Id.*

The Agreement contained an integration clause (¶ 13.2), which provided that the written document constituted the entire agreement between New England Dental and DentalNet and superseded "any prior understandings, agreements or representations by or between the Parties." Agreement at 18.

Hur also testified that DentalNet probably had an opportunity simply to give back the businesses, had it so desired. Mem. of Decision at 18.

At the time of the execution of the Agreement, Chalmers had a perfected security interest in the personal property of the Watertown practice, arising out of the earlier sale of that practice to New England Dental. *Id.* New England Dental failed to inform DentalNet of this security interest, although Hur and Ward admitted that their attorney also failed to conduct a UCC search to determine whether any of the assets to be purchased by DentalNet were encumbered. *Id.*

After New England Dental filed for bankruptcy, Chalmers contacted Hur and informed him of the security interest. *Id.* He apparently advised Hur that he was interested in taking back the Watertown practice and that he would take over DentalNet's promissory note to New England Dental. *Id.* at 18–19. Hur declined, however, and informed Chalmers that he was negotiating with the Chapter 11 trustee to acquire other dental practices once operated by New England Dental. *Id.* at 19.

In March 1998, Chalmers' attorney sent letters to Hur and Hur's attorney providing formal notice of the security interest and stating an intention to inspect the premises to take an inventory and to inspect the collateral. *Id.* A follow-up letter stated that Chalmers intended to repos-

sess the collateral on or after April 7, 1998 if Hur did not pay the secured sum of $255,000.00 by April 8, 1998. *Id.* Chalmers' attorney advised Hur that he was to "hold and safeguard the Collateral for the benefit of Chalmers, as the Secured Party, and will be held accountable for the loss or damage to the Collateral." *Id.* Ultimately, after resolving outstanding issues relating to the sale of the Newbury Street practice, Chalmers filed an amended proof of claim on December 5, 2001, stating he had an unsecured claim for $239,036.78 and a secured claim of $462. *Id.* at 19–20.

At the time of the Agreement, an entity known as HPSC was leasing certain equipment to New England Dental. *Id.* at 18. New England Dental represented in ¶ 8.8 of the Agreement that it would satisfy the amounts outstanding under the lease and transfer title to DentalNet within 45 days of the closing date. Agreement at 14. The Agreement contained a list of the leased equipment in Schedule 3.4(a), together with a list of its original value. A value of $9,604 was ascribed to the leased equipment at the Watertown practice and $23,169 was ascribed to the equipment at Wellesley. *Id.*

Some time after the closing, HPSC contacted DentalNet and informed it that, if it did not buy the equipment, HPSC would remove it. *Id.* Ward and Hur gave differing testimony about how much was paid to HPSC for the equipment. Ward "guessed" that $29,000.00 was paid for the equipment at the Watertown practice, whereas Hur testified that the total was $60,000 for both practices and that further equipment was purchased from HPSC because equipment from New England Dental malfunctioned. *Id.* In any event, no cancelled checks or other evidence was produced to provide a firm figure or explain the differing testimony. *Id.*

**C. The parties' contentions before the Bankruptcy Court**

Aquino, as Creditors' Trustee, sought payment from DentalNet and Hur for the Wellesley and Watertown dental practices. *Id.* at 21. DentalNet and Hur, in turn, contended that New England Dental made misrepresentations about the state of the practices and sought remedy in contract and fraud. *Id.* at 23. DentalNet and Hur, however, failed to file a timely proof of claim and, thus, were barred from affirmative recovery from the consolidated bankruptcy estate. *Id.* at 25. Accordingly, they sought to offset their damages against any claim by the Creditors' Trustee against them under *In re Calderone*, 166 B.R. 825 (Bankr.W.D.Pa.1994).

In a memorandum dated August 13, 2001, the Bankruptcy Court allowed motion for partial summary judgment made by DentalNet and Hur. Mem. on Boston Dental Group Inc. and Dr. Charles Hur's Mot. for Partial Summ. J., August 13, 2001 (hereinafter "August 13 Mem."), Appendix of the Appellants, Volume 2 at 243–263. The Bankruptcy Court held New England Dental liable for its failure to inform DentalNet of the Chalmers lien at the time of the sale to DentalNet and its failure to provide clear title to the HPSC equipment within 45 days as required by the Agreement. Aug. 13 Mem. at 20. Upon the record then before the Bankruptcy Court, however, no conclusion could be reached concerning the damages proximately caused by these two legal missteps. No appeal was taken from this ruling.

**II. DISCUSSION**

Having failed to establish the major part of their case against New England Dental, DentalNet and Hur raise eighteen issues appealing the Bankruptcy Court's decision of September 11, 2002. Appellant's Br. [Docket No. 12] at 2–3. The DentalNet

and Hur brief, however, groups some issues together and discusses them in an order different from the original listing. Similarly, New England Dental's brief addresses the same issues under different headings. This Court will mention each appeal issue for clarity and completeness, but will group them together for ease of discussion. Many of the issues are somewhat inconsequential in the context of the entirety of the Bankruptcy Court's decision or otherwise do not truly reflect the record before that court.

## A. Standard of Review

■ The applicable standard of review for legal conclusions of the bankruptcy court is de novo. *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994). Factual findings in bankruptcy appeals are reviewed under a "clearly erroneous" standard. Fed. R. Bank. P. 8013. This Court must give "due regard" to the opportunity of the bankruptcy court judge to evaluate the credibility of the witnesses. *Id.* Most of the issues raised by the Appellants on appeal present questions of fact.

## B. Findings related to the closing of the practices

### 1. Whether the Bankruptcy Court erred in finding that DentalNet and Hur failed to show evidence that New England Dental did not operate the practices until the closing date

### 2. Whether the Bankruptcy Court erred in finding that the cause of the fall in revenue at the practices was not a reduction in patients

■ DentalNet and Hur assert that the only possible reason for the dip in revenues in December 1997 was that the practices had already been closed by New England Dental, which would be a violation of the Agreement. In support of this, they cite the testimony of Hur, Rohardt, and Anoli and also the financial information provided by New England Dental at trial. The specific financial information referenced consists of two graphs depicting revenue at the practices. Appendix of the Appellant, Vol. 2 at 396–97.

Hur testified that he could think of only one reason for the dip in revenues—namely, that DMO patients had been reassigned. Mem. of Decision at 14–15. Rohardt testified that she was informed at a Christmas party that the Wellesley practice would be closing in January or February of 1998, and Anoli testified that he believed the Wellesley practice closed in December and that the Watertown practice closed at around that time, but was not sure of exact dates. *Id.* at 15.[4]

DentalNet and Hur point out that although New England Dental notified the DMOs within ten days of the closing (on or about January 13, 1998), the December revenues had already shown a dramatic shortfall. Appellants' Br. at 14. From this, they draw the inference that DMO patients had already been reassigned prior to the notification. *Id.*[5]

---

4. The brief of DentalNet and Hur mentions only that part of Rohardt's and Anoli's testimony that refers to the closing of the practices, and it fails to mention the timing.

5. DentalNet and Hur also object to the finding of the Bankruptcy Court that DentalNet's problems with DMOs appeared to have been related to credentialing issues rather than the precipitous closing of the practices. *Id.; see*

*also* Mem. of Decision at 28–29. This finding, however, was based on Hur's own evidence that DentalNet was required to complete a credentialing program which took three months. Mem. of Decision at 16. DentalNet and Hur make a bald assertion that "[t]he evidence shows that [DentalNet] was credentialed by DMO providers both before and after the sale," Appellant's Br. at 14, but offer no indication of what that evidence might be.

There was also evidence from Anoli that there was a certain amount of seasonality to the practices. *Id.* The Bankruptcy Court relied on this as an alternative reason for the dip in revenues.

There was no error. Two plausible explanations for the dip in revenues were presented—that the practices were closed and that seasonality and credentialing issues came into play. Mem. of Dec. at 27. There is no clear error in the finding of the Bankruptcy Court that the latter was the more reliable inference.

**C. Findings related to due diligence and obtaining financial information about the practices**

1. **Whether the Bankruptcy Court erred in finding that ¶ 5.1 of the Agreement gave DentalNet rights to obtain financial information from New England Dental**

2. **Whether the Bankruptcy Court erred in holding that New England Dental was not obliged to inform DentalNet and Hur of the shortfall in actual revenue for December 1997**

3. **Whether the Bankruptcy Court erred in finding that DentalNet and Hur had a duty to perform due diligence**

4. **Whether the "boilerplate" integration clause bars recovery for misrepresentation**

The Bankruptcy Court found that DentalNet and Hur did not produce evidence that they had requested financial information in writing from New England Dental, as they were entitled to do under ¶ 5.1 of the Agreement. DentalNet and Hur argue that it was impossible for them to request such information because the Agreement was not actually signed until the closing date. Appellant's Br. at 18–19.

The Agreement is dated December 31, 1997, although the date appearing next to the signatures is January 9, 1998 (the closing date). Agreement at 21. Even if the Agreement was not signed until the closing date, however, it was clearly in negotiation before that time. There is simply no evidence that DentalNet and Hur would have been denied financial information, had they requested it, even if the Agreement were still in the negotiation phase at that time. There is no error in the determination of the Bankruptcy Court that DentalNet and Hur failed to request the financial information about which they now complain.

Moreover, DentalNet and Hur strain the bounds of professionalism when they argue that "[t]he Court's reliance on a contractual provision which had no practical application evidences its bias." Appellant's Br. at 16. As detailed above, there is no reason to draw such a conclusion concerning the negotiation phase. Further, there is absolutely no basis for alleging bias in the Court's finding.

■ With respect to New England Dental's alleged obligation to inform DentalNet that the December revenues were well below projection, because this was an asset sale, New England Dental was under no obligation to provide information pertaining to revenues and the Agreement contains no representations with respect to revenues, as the bankruptcy court so ruled. Mem. of Decision at 27. Furthermore, New England Dental had disclosed that the practices lost money and were projected to continue losing money in 1997. *Id.* While DentalNet and Hur argue that New England Dental was selling DMO practices which were closed and whose patients had been transferred, Appellants'

Nor does the brief attempt to explain Hur's own testimony to the contrary.

Br. at 22–23, the bankruptcy court was not persuaded. Matters of credibility are for it—not this Court—to determine.

■ DentalNet and Hur further aver that DentalNet would not have bought the practices had it known that the practices' revenues were decreasing, and that they reasonably relied on representations made by New England Dental to the contrary. *Id.* at 26. They object to the Bankruptcy Court's finding that DentalNet's loss was attributable to its "lack of due diligence and false assumptions," *id.* at 29; Mem. of Decision at 31, asserting that this finding is inconsistent with the court's August 13 decision wherein the court stated that

> failure to investigate the veracity of statements does not, as a matter of law, bar recovery for misrepresentation. Indeed, courts have stated that only reliance on preposterous or palpably false representations vitiates a misrepresentation claim.

August 13 Mem. at 18 (internal quotations and citations omitted).

There is, however, no inconsistency. The Agreement contained an integration clause at Paragraph 13.2 providing that the Agreement constituted the entire agreement between the parties and superseded any prior representations. Further, paragraph 5.1 provided that DentalNet was to have access to information—including financial records—and that these could be requested in writing from New England Dental. Paragraph 4.7 of the Agreement also confirmed that no warranties or representations were given as to the assets being transferred. The onus, therefore, was on DentalNet to satisfy itself as to the true state of the practices—it was DentalNet's responsibility to request financial records under paragraph 5.1 and DentalNet's responsibility to exercise due diligence. DentalNet cannot now assert reliance on alleged misrepresentations as to the financial affairs of the practices.

### D. Findings related to damages

1. Whether the Bankruptcy Court erred in finding that DentalNet and Hur had not sustained real economic injuries
2. Whether DentalNet and Hur proved damages
3. Whether the Bankruptcy Court erred in finding that DentalNet and Hur were not damaged by the purchase of equipment which was subject to liens
4. Whether the Bankruptcy Court erred in finding that DentalNet and Hur did not incur losses at the practices
5. Whether the Bankruptcy Court erred in finding that DentalNet and Hur did not have lost profits
6. Whether the Bankruptcy Court erred in finding inconsistency between the testimony of two witnesses where one stated his evidence was a "guess"

The first assertion by DentalNet and Hur is that the practices lost money. Appellant's Br. at 16. The Bankruptcy Court agreed that the Watertown practice lost an indeterminate amount of money but found that the Wellesley practice broke even. DentalNet and Hur do not attempt to assert that Wellesley lost money [6] and merely refer to the Bankruptcy Court's statement that "[Hur] testified ... that DentalNet lost between \$12,000 and \$14,000 per year on the Watertown prac-

---

**6.** Indeed, at page 21 of their Brief, DentalNet and Hur state that "[t]here is no dispute that the Wellesley practice largely broke even."

This is in contrast to their statement at page 16 that both practices lost money.

tice .... In contrast, Ward testified that the Watertown practice lost approximately $192,000." Mem. of Decision at 17; Appellant's Br. at 17. DentalNet and Hur argue that there is no "contrast" between the two witness' testimony. Their explanation, however, is extremely confused, alleging that overheads were not included in the accounting system for the practices and stating that "[t]he record is devoid of evidence as to how Mr. Ward calculated the total loss". Appellant's Br. at 17–18.

Regardless, there is a discrepancy between testimony that the Watertown practice lost $12,000 to $14,000 per year and testimony that it lost $192,000 between 1998 and 2001. The relevance of this issue is also unclear because there was no finding by the bankruptcy court that Watertown did not lose money.

■ The next issue concerns the HPSC equipment. There is no dispute that DentalNet was required to purchase some equipment from HPSC, because New England Dental failed to provide clear title to the equipment as required by the Agreement. DentalNet and Hur here assert that this failure cost DentalNet $60,000. Appellant's Br. at 18. The inference, however, is hardly compelling. Ward testified that he "guessed" that the equipment for the Watertown practice cost $29,000, and Hur stated that the total cost for both practices was $60,000. No financial records showing payments to HPSC were produced. In the circumstances, the Bankruptcy Court concluded it was unable to make a finding as to the amount paid. Mem. of Decision at 30. Because DentalNet and Hur bore the burden of proof on this damage issue, their failure to convince the Bankruptcy Court cannot here be engineered into clear error on its part.

■ The third issue relates to lost profits. Hur stated at trial that he expected to make a profit of 10% of the gross revenue of each practice. Mem. of Decision at 17. No evidence was ever presented to prove that this was a reasonable expectation. Given the absence of proof, the Bankruptcy Court found that DentalNet was not harmed. *Id.* at 31. Here, DentalNet and Hur merely assert that New England Dental has not offered evidence suggesting that a ten percent profit was unreasonable and makes the conclusory statement that "[DentalNet] had a rational basis for its claim of lost profits." Appellant's Br. at 19, 21. They argue that *Augat, Inc. v. Aegis, Inc.,* 417 Mass. 484, 631 N.E.2d 995 (1994), *Our Lady of the See Corp. v. Borges,* 40 Mass.App.Ct. 484, 665 N.E.2d 128 (1996) and *Thermo Electron Corp. v. Schiavone Construction Company,* 958 F.2d 1158 (1st Cir.1992) are authority for the proposition that lost profits need not be calculated with mathematical certainty so long as there is a rational basis for the amount. True enough. Hur's bald assertion that he expected a ten percent profit, however, does not amount to a rational basis for calculating lost profits. Because the burden of proof rests on DentalNet and Hur, the mere assertion of a claim for 10% profits is insufficient to establish such a claim.

■ The final issue in this group is the Chalmers lien over equipment at the Watertown facility. New England Dental represented that it was selling the equipment free of any liens and that it was a clear breach the Agreement in that it did not inform DentalNet of the Chalmers security. This issue was separately adjudicated: a finding was made in favor of DentalNet as to liability but the question of damages was left to trial. Mem. of Decision at 8; *see also* August 13 Mem. At trial, it was held that no damage was shown to have arisen from this misrepresentation. *Id.* at 30–31. Specifically, DentalNet did not pay Chalmers pursuant to

his demand letters and simply continued to hold the equipment subject to his interest. *Id.* Chalmers has since amended his claim against the New England Dental bankrupt estate, *id.,* 19–20, and it is unclear how this affect the equipment owned by DentalNet. DentalNet and Hur now assert some reduction in the value of the equipment (although this is not clearly explained). Appellants' Br. at 21. In the absence of any clear evidence demonstrating the value of the equipment and how the value has diminished, however, the bankruptcy court was well within the bounds of reason when it declined to make a finding of economic loss.

**E. Mitigation of loss**

**1. Whether DentalNet should have closed the practices**

**2. Whether the Bankruptcy Court erred in finding that DentalNet should have contacted patients**

**3. Whether the Bankruptcy Court erred in finding that the election of contractual remedies by DentalNet and Hur showed that damage had not accrued or that they failed to mitigate damage**

On the ground that the Wellesley practice largely broke even and DentalNet would have been liable for the rent on the Watertown premises, had it closed that practice, *id.* at 22, DentalNet and Hur argue that they mitigated their loss by keeping the practices open.

There is no evidence of the terms of the Watertown lease or what DentalNet's obligations would have been, had it closed that practice. There is a quotation in New England Dental's brief from the Bankruptcy Court's Decision indicating a finding that DentalNet actually renewed its leases. This quotation appears to come from page 33 of the Decision, which is missing from the copies provided. Assuming that finding to have been made (based on the representations of Counsel for New England Dental), DentalNet cannot assert that it would have been liable for rent at Watertown had it closed the practice because DentalNet was not obliged to renew the lease, which would have mitigated any damages.

Second, the Bankruptcy Court found that DentalNet failed to undertake marketing efforts to attract patients to the practices, including contacting patients to inform them of the change of ownership. Mem. of Decision at 32. Undertaking such activities would have amounted to taking a step toward mitigating loss.

Third, Hur himself admitted that he could have given the practices back to New England Dental and did not do so. *Id.* at 18. He does not explain why DentalNet continued to operate businesses at a loss from January 1998 to the end of trial in June 2002 (a period of four and a half years) when there was an opportunity to give them back. The Bankruptcy Court correctly found lack of mitigation here.

**F. Breach of Mass. Gen. Laws ch. 93A**

**1. Whether the Bankruptcy Court erred in finding that New England Dental did not violate Mass. Gen. Laws ch. 93A by failing to disclose the fall in revenue**

DentalNet and Hur argue that New England Dental breached Mass. Gen. Laws ch. 93A by failing to disclose the fall in revenue.[7] They argue that New

---

7. 940 Code Mass. Regs. § 3.16 provides: Without limiting the scope of any other rule, regulation or statute, an act or practice is a violation of M.G.L. c. 93A, § 2 if:
. . .

England Dental knew that the practices' revenues had decreased and that patients had been reassigned and the practices were closed; that DentalNet would not have bought the practices had it known of any of these facts; and that New England Dental failed to disclose the facts to DentalNet. Appellant's Brief, 27.

██ The Appellants' argument is without merit. Although Chapter 93A authorizes violation of the Attorney General's regulations—as in 940 C.M.R. 3.16—liability under the regulation attaches only to transactions involving private consumers, and not to business to business transactions. *See Knapp Shoes Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737, 743–44, 640 N.E.2d 1101 (1994). In *Knapp Shoes*, the Supreme Judicial Court held that the Attorney General's regulations did not apply to a contract dispute between businessmen based on breach of implied warranty of merchantability. *Id.* Specifically, the Court noted that the regulations were promulgated when Chapter 93A "protected consumers, but not persons engaged in trade or commerce, from unfair or deceptive acts or practices." *Id.* at 744, 640 N.E.2d 1101; *see also* Dwight Golann, *Standards of Conduct Under Chapter 93A: What Is a Section 11 Violation? in* Multiple Damage Claims in Business Litigation 1, 10–11 (1993). As the Court in *Knapp* suggested, the regulations were not meant to apply to mundane negotiations between businesses and business people. Indeed,

to so apply them, and thereby to require complete disclosure from both ends of a business deal, would eviscerate the very notion of negotiating. This Court follows the sound reasoning of the Court in *Knapp* and rules that § 3.16 is inapplicable to the case at bar. Therefore, New England Dental was under no obligation to provide information as to revenues in the context of the asset purchase.[8]

### G. Rescission and judicial bias

### 1. Whether the Court was biased in favor of the remedy of rescission

██ The Bankruptcy Court referred at several points to DentalNet's failure to rescind the Agreement. These statements were largely made in the context of mitigation of loss. Mem. of Decision at 31–32. There was also a statement in the Memorandum of August 13, 2001, that, owing to DentalNet's failure to file a timely proof of claim in New England Dental's bankruptcy, "[DentalNet and Hur] are limited to setting off their damages from any claim that the Creditors' Trustee would have against them if this Court were to *rescind* the Asset Purchase and Sale Agreement." August 13 Mem. at 20 (emphasis added).

From this statement, DentalNet and Hur draw the conclusion that the Bankruptcy Court was biased in favor of the remedy of rescission and has drawn adverse inferences against them on the basis

(2) Any person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction; ...

8. DentalNet and Hur argue that chapter 93A violations were also committed when New England Dental failed to disclose the Chalmers lien and tender clear title to the HPSC equipment. *Id.* at 28. These arguments have been canvassed elsewhere. The Bankruptcy

Court found that New England Dental failed to disclose the Chalmers lien and likewise failed to tender clear title to the HPSC equipment, and that these failures did indeed constitute a breach of Mass. Gen. Laws ch. 93A, § 11. *See* August 13 Mem. No damages were awarded, however, because no damage was found to have flowed from the Chalmers lien and it was impossible to compute damages arising from the HPSC equipment. There was no error.

of their failure to rescind. Appellants' Br. at 37–40; Appellant's Reply Br. [Docket No. 15] at 6–8.

■ There is simply no basis for concluding that the Bankruptcy Court was so biased. As stated above, the context of most of the references to rescission was that of mitigation of damages. Reference to legal remedies and the legal consequences which flow therefrom is not evidence of bias.

### H. Turning over Watertown equipment to Chalmers

### 1. Whether DentalNet had an obligation to pay Chalmers or turn over Watertown equipment to him

DentalNet and Hur assert that the Bankruptcy Court ruled that DentalNet should have turned over the Watertown equipment to Chalmers. Appellant's Br. at 40. The Court need not address this issue because no such ruling appears in the Decision.

### III. CONCLUSION

In the absence of any legal or factual error, the decision of the Bankruptcy Court is AFFIRMED.

SO ORDERED.